IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION



UNITED STATES OF AMERICA,

    v.

CRIMINAL NO. 4:12cr101

JEFFREY A. MARTINOVICH,

    Defendant

## OPINION AND ORDER CONCERNING DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

This matter comes before the Court upon Jeffrey A. Martinovich's ("Defendant") Motion for Judgment of Acquittal and New Trial. ECF No. 100. For the reasons set forth herein, the Court: (1) **DENIES** Defendant's Motion for Judgment of Acquittal on Counts 1, 6-14, 17-18, and 20-23; (2) **GRANTS** Defendant's Motion for Judgment of Acquittal on Count 19; (3) **DENIES** Defendant's Motion for Judgment of Acquittal on Counts 3-5, 24, and 26, which the jury could not agree on; and (4) **DENIES** Defendant's Motion for New Trial.

## CONTENTS

I.     PROCEDURAL HISTORY ................................................................................ 2

II.    DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29(C) ......................................................... 4

   A.    STANDARD OF REVIEW ........................................................................ 5

   B.    FACTUAL BACKGROUND ...................................................................... 6

   C.    THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE TO SUPPORT DEFENDANT'S CONVICTIONS ON COUNTS 1 AND 6-14 ............ 16

   D.    DEFENDANT'S CONVICTIONS ON COUNTS 17-23 AND THE "MERGER PROBLEM" ........................................................................... 17

      1.    Standard of Review ................................................................... 18

         a.    The "Merger Problem" and the Pre-FERA Two-Step Analysis .................... 18

1

b. The Pre-FERA Standard of Review Governs the Court's Analysis of Counts 17-23 ................................................................................................ 23

2. **Discussion.** ...................................................................................................... 25

 a. The Funds Underlying Counts 17, 18, and 20-23 Were Not Used to Pay Any Essential Expense of the Predicate Mail and/or Wire Fraud ............ 25

 b. Defendant's Conviction on Count 19 Must Be Reversed, as the Merger Problem Arises and the Government Failed to Offer Evidence of Net Proceeds ...................................................................................................... 30

E. **DEFENDANT IS NOT ENTITLED TO A MOTION FOR JUDGMENT OF ACQUITTAL ON COUNTS 3-5, 24, AND 26, WHICH THE JURY COULD NOT AGREE ON** ................................................................................................. 31

III. **DEFENDANT'S MOTION FOR NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33** .................................................................................. 32

A. **STANDARD OF REVIEW.** ...................................................................................... 32

B. **DISCUSSION.** ......................................................................................................... 32

IV. **CONCLUSION** ................................................................................................ 36

## I. PROCEDURAL HISTORY

On October 10, 2012, Defendant was charged in a 26-count Criminal Indictment with: (1) Count 1, Conspiracy to Commit Mail and Wire Fraud, in violation of Title 18, United States Code, Section 1349; (2) Counts 2-9, Wire Fraud, in violation of Title 18, United States Code, Sections 1343 and 2; (3) Counts 10-14, Mail Fraud, in violation of Title 18, United States Code, Sections 1341 and 2; (4) Counts 15-23, Engaging in Monetary Transaction in Property Derived from Specified Unlawful Activity, in violation of Title 18, United States Code, Sections 1957 and 2; and (5) Counts 24-26, Fraudulent Oaths and Declarations in Relation to a Bankruptcy Proceeding, in violation of Title 18, United States Code, Section 152 and 2. ECF No. 1.

Defendant's trial on those charges began on April 10, 2013. On April 24, 2013, the Court granted Defendant's Motion for Judgment of Acquittal with respect to Count 25, which alleged Fraudulent Oaths and Declarations in Relation to a Bankruptcy Proceeding, in violation of Title 18, United States Code, Section 152 and 2.

2

The jury began its deliberations on May 2, 2013. See Min. Entry, May 2, 2013, ECF No. 89. On May 6, 2013, the Jury returned a verdict which found Defendant guilty of: (1) Count 1, Conspiracy to Commit Mail and Wire Fraud, in violation of Title 18, United States Code, Section 1349; (2) Counts 6-9, Wire Fraud, in violation of Title 18, United States Code, Sections 1343 and 2; (3) Counts 10-14, Mail Fraud, in violation of Title 18, United States Code, Sections 1341 and 2; and (4) Counts 17-23, Engaging in Monetary Transaction in Property Derived from Specified Unlawful Activity, in violation of Title 18, United States Code, Sections 1957 and 2. Jury Verdict, ECF No. 92.

The jury returned a verdict of not guilty with respect to: (1) Count 2, Wire Fraud, in violation of Title 18, United States Code, Sections 1343 and 2; and (2) Counts 15-16, Engaging in Monetary Transaction in Property Derived from Specified Unlawful Activity, in violation of Title 18, United States Code, Sections 1957 and 2.

The Jury advised the Court that it could not reach a verdict with respect to: (1) Counts 3-5, Wire Fraud, in violation of Title 18, United States Code, Sections 1343 and 2; and (2) Counts 24 and 26, Fraudulent Oaths and Declarations in Relation to a Bankruptcy Proceeding, in violation of Title 18, United States Code, Section 152 and 2. The Court declared a mistrial as to those counts on which the jury could not reach a verdict. Jury Verdict, ECF No. 92; see also Min. Entry, May 6, 2013, ECF No. 91.

Defendant filed the instant Motion for Judgment of Acquittal and New Trial on May 20, 2013. ECF No. 100. The Government requested a one-week extension to file its Response. Gov.'s Mot. for Ext. of Time, ECF No. 101. For good cause shown, the Court granted the Government's Motion and ordered the Response to be filed on or before Friday, June 7, 2013 at 5:00 P.M. Eastern Standard Time. Ord., ECF No. 102. In accordance with the Court's Order,

3

the Government filed its Response on June 7, 2013 at 4:17 P.M. Eastern Standard Time. Gov.'s Resp. to Def.'s Mot. for J. of Acq. & New Trial, ECF No. 105.

## II.   DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29(c)

Rule 29 of the Federal Rules of Criminal Procedure requires a Court, on a defendant's motion, to enter a Judgment of Acquittal with respect to "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "A defendant may move for a judgment of acquittal, or renew such motion, within 14 days after a guilty verdict . . . ." Fed. R. Crim. P. 29(c).

Defendant moves the Court, pursuant to Rule 29(c), for a Judgment of Acquittal on various charges. The verdict was returned on May 6, 2013. Jury Verdict, ECF No. 92; see also Min. Entry, May 6, 2013, ECF No. 91. Defendant filed the instant Motion for Judgment of Acquittal and New Trial on May 20, 2013. ECF No. 100. The Court **FINDS** that Defendant's Motion for Judgment of Acquittal was timely filed and will proceed to consider the merits of said Motion.

Defendant argues for Judgment of Acquittal on three distinct sets of charges. ECF No. 100. First, Defendant's argues that insufficient evidence of false or fraudulent conduct was presented at trial to support Defendant's convictions on Counts 1 and 6-14. See Def.'s Mot. for J. of Acq. & New Trial 2-3, ECF No. 100. Second, Defendant argues that the Government failed to present evidence that the monetary transactions serving as the basis for his convictions on Counts 17-23 involved the "net profits" of his fraudulent scheme, as is allegedly required by United States v. Santos, 553 U.S. 507 (2008), and its progeny, see Def.'s Mot. for J. of Acq. & New Trial 3, ECF No. 100. Finally, Defendant argues that no rational trier-of-fact could conclude guilt beyond a reasonable doubt on the hung counts—Counts 3-5, 24, and 26—and

4

accordingly moves for Judgment of Acquittal on those counts. See Def.'s Mot. for J. of Acq. & New Trial 3, ECF No. 100. The Court will address each of these arguments in the subsections set forth below.

## A. STANDARD OF REVIEW

When considering a challenge to the sufficiency of the evidence, the proper test is whether, "[v]iewing the evidence in the light most favorable to the Government," United States v. Hickman, 626 F.3d 756, 762-63 (4th Cir. 2010) (quoting United States v. Bynum, 604 F.3d 161, 166 (4th Cir. 2010), cert. denied, 130 S. Ct. 3442), cert. denied, 626 F.3d 756, the court is able "to determine whether the conviction is supported by 'substantial evidence.'" Id. at 763 (quoting United States v. Young, 609 F.3d 348, 355 (4th Cir. 2010). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. (internal quotation marks omitted) (quoting Young, 609 F.3d at 355).

"A defendant challenging the sufficiency of the evidence bears 'a heavy burden,' as '[r]eversal . . . is reserved for the rare case where the prosecution's failure is clear.'" United States v. Melvin, No. 12-4195, 2013 WL 323286, at *1 (4th Cir. Jan. 29, 2013) (unpublished decision) (quoting United States v. Ashley, 606 F.3d 135, 138 (4th Cir. 2010), cert. denied, 131 S. Ct. 428)). The court is to "consider the evidence in the light most favorable to the government, making all inferences and credibility determinations in its favor." United States v. Hoyte, 51 F.3d 1239, 1245 (4th Cir. 1995) (citing United States v. Williams, 41 F.3d 192, 199 (4th Cir. 1994), cert. denied, 514 U.S. 1056 (1995)), cert. denied, 516 U.S. 935.

**B.    FACTUAL BACKGROUND**

Viewing the evidence presented at trial in the light most favorable to the Government, the Court will first set forth the factual predicate by which it will assess Defendant's arguments.

In or about 1999, Defendant founded the Martinovich Investment Consulting Group ("MICG"), a financial services company that provided investment advice and investment-related services to its clients. As a typical broker-dealer, MICG was initially dedicated to investing client money in traditional investment vehicles such as stocks, bond, and annuities. MICG was licensed by the Securities and Exchange Commission ("SEC") and subject to regulation by the Financial Industry Regulatory Authority ("FINRA").

MICG utilized First Clearing, LLC ("First Clearing"), which is now a non-bank affiliate of Wells Fargo & Company, to provide brokerage account services. Amongst other things, First Clearing compiled and issued investor statements with account and/or or investment portfolio information to MICG's clientele. Those statements were sent to MICG's clients by mail or electronic means, and reflected the values that Defendant and MICG provided to First Clearing concerning the performance of a client's investment portfolio.

Defendant was initially partnered with various persons and entities in his operation of MICG. However, in or about 2005, Defendant became the sole owner and Chief Executive Officer ("CEO") of MICG. Under Defendant's stewardship there was significant expansion at MICG. At its pinnacle, MICG maintained approximately eight (8) offices and employed approximately fifteen (15) brokers. However, with that expansion came a significant increase in the firm's expenses. In addition to office space, marketing, and salaries, MICG was expending significant sums on luxuries like corporate retreats for clients and employees, as well as lavish holiday parties.

MICG also expanded its investment offerings during this period, resulting in the formation of three hedge funds. First, in 2006, Defendant formed MICG Partners, LP ("Partner's Fund"), followed by Anchor Strategies, LLC ("Anchor Fund") that same year. In June 2007, Defendant formed MICG Venture Strategies, LLC ("Venture Strategies Fund"). Each hedge fund was governed by a Private Placement Memorandum ("PPM") which provided the terms for management of the fund.

Defendant was the sole manager of the Venture Strategies Fund. Though other MICG employees performed functions on the fund's behalf, Defendant had final decision making authority concerning investment decisions, the values assigned to Fund assets, and the amount the Fund's clients owed each year in management and incentive fees. However, pursuant to the Venture Strategies Fund's PPM, as sole manager Defendant owed the Fund's clients both a fiduciary duty to act in their best interest, and further had a responsibility to exercise good faith and fairness in all dealings affecting the Fund. See e.g., Gov.'s Trial Ex. B-1a, at 54 (setting forth Standard of Care, in the Venture Strategies Fund's PPM, which the Fund Manager owed to investors). The PPM further provided that Defendant's compensation was tied directly to the Venture Strategies Fund's performance. Defendant was entitled to a 1 percent management fee (paid in quarterly increments) and 20 percent incentive fee (paid annually). See e.g., Gov.'s Trial Ex. B-1a (providing sample PPM of the Venture Strategies Fund).

As with MICG, the Venture Strategies Fund utilized First Clearing to provide brokerage account services, including the compilation and issuance of investor statements reflecting the Fund's performance based on information supplied by Defendant. The Venture Strategies Fund also maintained an account with First Clearing, with check-writing privileges for the purpose of

receiving investments and making disbursements. Defendant was the only individuals at MICG with check-writing privileges on the Venture Strategies Fund's First Clearing account.

In November 2006, Bruce Glasser ("Glasser"), an investment banker in New York, NY, came to be employed with MICG. Glasser convinced Defendant to take advantage of an investment opportunity in EPV Solar, Inc. ("EPV Solar"), a privately-held solar energy company. Defendant and Glasser anticipated an initial public offering ("IPO") of EPV Solar in mid-2008, which they believed would dramatically increase the company's value. Defendant established the Venture Strategies Fund for the express purpose of taking advantage of the EPV Solar opportunity. In June 2007, Defendant purchased 1,000,500 shares of EPV Solar common stock through the Venture Strategies Fund at a price of $1.15 per share. In September 2007, Defendant purchased another 800,000 shares of EPV Solar common stock through the Venture Strategies Fund, again at a price of $1.15 per share.

Pursuant to the Venture Strategies Fund's PPM, because EPV Solar was not a publicly traded company Defendant was required to obtain an independent valuation of EPV Solar so as to: (1) inform investors of the value of their holdings; and (2) calculate the management and incentive fees owed to Defendant. That value would be reflected in the client statements that First Clearing provided to Venture Strategies Fund clients on Defendant's behalf. Barring losses to any of the Venture Strategies Fund's other investments, an increase in the value of EPV Solar would necessarily result in an increase in the value of a client's investment portfolio. This, in turn, would allow Defendant to withdraw larger management and incentive fees from the Venture Strategies Fund's account at First Clearing.

Rather than obtain an independent valuation of EPV Solar, as required by the PPM, Defendant enlisted Glasser to identify someone who could value EPV Solar's stock. Glasser

8

contacted Steven Gifis ("Gifis"), an EPV shareholder and employee who had brokered the original deal for MICG to invest in EPV Solar. Gifis contacted J. Peter Lynch ("Lynch"), a solar industry expert, EPV Solar shareholder, and EPV Solar consultant. Gifis asked Lynch to write a valuation for EPV Solar, representing that it was to be used by the Chair of EPV Solar's Board of Directors to value his personal holdings in the company. Lynch was not aware that the valuation: (1) would be used outside of EPV Solar; (2) would be used to calculate matters relating to a hedge fund; or (3) was produced at Defendant's request. Under those false pretenses, Lynch signed a document valuing EPV Solar at $2.13 per share for end-of-year 2007. See Gov.'s Trial Ex. A-8 (unsigned, undated valuation at $2.13 per share for EPV at end-of-year 2007); Gov.'s Trial Ex. A-9 (signed, undated valuation at $2.13 per share for EPV at end-of-year 2007); Gov.'s Trial Ex. D-27 (providing EPV valuation illustration chart). Defendant did not compensate Glasser, Gifis, or Lynch for their involvement in the production of that valuation. On the basis of that valuation, Defendant withdrew $357,019.00 from the Venture Strategies Fund's First Clearing account as his 2007 incentive fee. See Gov.'s Trial Ex. D-10 (journal entry dated December 24, 2007, representing a check transfer in the amount of $273,600.00, and journal entry dated December 28, 2007, representing a wire transfer in the amount of $83,419.00)

In 2008, Defendant added two other investments to the Venture Strategies Fund: (1) the Derby County Rams ("Derby Rams"), a privately-held British soccer team; and (2) a bond connected to a crane company. Like EPV Solar, Defendant was required to obtain an independent valuation of the Derby Rams because it was privately-held investment.

The IPO of EPV Solar, which Defendant had anticipated in September 2008, failed to occur because financing for the offering dissolved. MICG clients who had invested in the

Venture Strategies Fund sought to redeem their investments. Defendant: (1) denied the requests; (2) dissuaded redemption; or (3) made excuses as to why redemption was not possible. Defendant did, however, redeem $100,000 of his own investment in the Venture Strategies Fund in October 2008.

Despite EPV Solar's troubles, Defendant continued to encourage investment in the Venture Strategies Fund. Defendant: (1) did not disclose the negative impact the market crash had on EPV Solar; (2) assured investors that they could redeem their investments whenever they wanted, notwithstanding his prior denial of redemption requests; and (3) began convincing unsophisticated investors to invest in the Venture Strategies Fund, knowing that hedge fund participation was limited by federal regulation to wealthier, accredited investors. Defendant used some of the new investment money to repay investors who had requested redemptions, as well as to pay himself management and incentive fees.

Toward end-of-year 2008, Defendant again sought to secure a fraudulent valuation of EPV Solar. Gov.'s Trial Ex. A-21 (Defendant emailing Glasser regarding update to 2007 EPV valuation). On December 6, 2008, Defendant sent Glasser an email with an edited version of the fraudulent 2007 valuation, now assigning a price of $2.16 per share. Gov.'s Trial Ex. A-23. Defendant had manufactured that $2.16 per share value. Glasser forwarded the edited valuation to Gifis, who again approached Lynch and requested that he approve the valuation with the predetermined per share value—$2.16—as a favor to EPV Solar's Chair. Lynch approved the $2.16 valuation and, on January 4, 2008, Glasser transmitted that valuation to Defendant by email. Gov.'s Trial Ex. A-44.

On January 2, 2009, three withdrawals were made from the Venture Strategies Fund's First Clearing account. Those withdrawals represent Defendant's payment of management and

incentive fees owed to him based, in part, on the fraudulent $2.16 EPV Solar valuation. The first, in the amount of $6,388.49, represents missed management fee payments for the 2nd and 3rd quarters of 2008. The second, in the amount $21,974.98, represents the management fee payment for the 4th quarter of 2008. The third, in the amount of $450,000.00, represents the 20 percent incentive fee owed to Defendant for the Venture Strategies Fund's alleged 2008 increase in value.

The $2.16 per share valuation of EPV Solar that Defendant had authored and Lynch approved, which Defendant received on January 4, 2009, proved inadequate to justify the $450,000.00 incentive fee Defendant withdrew from the Venture Strategies Fund's First Clearing account on January 2, 2009. See Gov.'s Trial Ex. D-10 (entry dated January 2, 2009, which evidences the deposit of a $450,000.00 check for incentive fees that Defendant had dated December 31, 2008). The $450,000.00 incentive fee was based, in part, on Defendant's belief that the value of the Venture Strategies Fund's investment in the Derby Rams had increased to $7,595,000.00, a gain of $2,595,000.00. See Gov.'s Trial Ex. A-34. However, on December 29, 2008, an email was sent from Michael Umscheid ("Umscheid"), an independent auditor with Harbinger, PLC, sent an email stating that "I am not in agreement with Jeff's [Defendant's] calculations for derby rams." Gov.'s Trial Ex. A-34. After Umscheid's objection to Defendant's inflated valuation, the Derby Rams came to be valued at only $6,000,000.00 for end-of-year 2008 instead of $7,595,000.00.

To justify the $450,000.00 in incentive fees that he had already withdrawn from the Venture Strategies Fund's account, Defendant authored and transmitted a second valuation for Lynch's approval, now setting EPV Solar's per share value at $2.42. Defendant received the Lynch-approved $2.42 valuation on January 7, 2009, just three days after receiving the valuation

11

at $2.16 per share. Gov.'s Trial Ex. A-48. There was no change in EPV Solar's prospects which would justify the $0.28 per share increase in just a matter of days. That initial $2.42 per share valuation was unsigned so, on January 15, 2009, Glasser forwarded Defendant and Umscheid a signed valuation for EPV Solar at $2.42 per share, which Lynch had signed. Gov.'s Trial Ex. A-48 (unsigned $2.42 per share valuation for EPV Solar); Gov.'s Trial Ex. A-52 (signed $2.42 per share valuation for EPV Solar).

However, even that $2.42 per share valuation proved inadequate to justify the $450,000.00 incentive fee Defendant had withdrawn from the Venture Strategies Fund's account on January 2, 2009. Therefore, Defendant authored and transmitted a third valuation for Lynch's approval, this time setting EPV Solar's per share value at $2.88. Gov.'s Trial Ex. A-53; Gov.'s Trial Ex. A-64; Gov.'s Trial Ex. A-77; Gov.'s Trial Ex. A-82. The evidence presented at trial showed that, as with the increase from $2.16 to $2.42 per share, there had been no change in EPV Solar's prospects which would justify the sudden increase in share value from $2.42 to $2.88.

Defendant did not compensate Glasser, Gifis, or Lynch for their involvement in securing the aforementioned fraudulent valuations. This is consistent with Defendant's trial testimony, as well as his Motion for Judgment of Acquittal, which contends that Lynch's valuations were validly obtained. See Def.'s Mot. for J. of Acq. & New Trial 2, ECF No. 100 (alleging that Lynch "repeatedly testified to the validity of his valuation").

The fraudulently-obtained per share values of EPV Solar were included in First Clearing statements sent to clients that held positions in the Venture Strategies Fund. See Gov.'s Trial Ex. A-70, Jan. 19, 2009 (email from Defendant directing MICG employees to update Venture Strategies Fund client statements for January 2009 with $2.88 EPV Solar per share value).

12

Defendant caused those statements to be transmitted to the Venture Strategies Fund's clients by the Postal Service, private commercial interstate carriers, or wire communications in interstate commerce. Throughout spring 2009, Defendant also regularly referred to the $2.88 per share value for EPV Solar when luring new investors into the Venture Strategies Fund, as well as to convince existing investors that their portfolios were secure.

It was further evident from evidence presented at trial that Defendant understood that the $2.88 per share value for EPV Solar was materially excessive. At the same time Defendant was securing the fraudulent valuation of EPV Solar for end-of-year 2008, Giffis was emailing Glasser requesting that MICG find buyers for EPV Solar shares at a price well-below $2.88. In an email dated January 16, 2009, Giffis states that he had identified two shareholders willing to sell 1.5 million shares of EPV Solar stock for $0.90 a share. Giffis suggests that Defendant and Glasser market the shares at $1.00 per share, the value that EPV Solar had assigned to a convertible preferred share at that time. Giffis states that, assuming certain events were to occur in the following weeks, he expected EPV Solar's shares to rise to between $1.25 and $1.50 per share. See Gov.'s Trial Ex. A-66.

On January 22, 2009, Defendant emailed a number of persons, including Glasser, stating that he had identified six individuals in the Young Presidents Organization ("YPO") willing to purchase at least $1,000,000.00 of EPV Solar stock. In response, Glasser replied only to Defendant, inquiring as to how many shares the YPO buyers wished to purchase. According to Glasser, he had identified 1.5 to 2 million shares of EPV Solar stock to sell at $0.90 per share. Gov.'s Trial Ex. A-74. On January 23, 2009, Defendant sent an email to another MICG employee stating that he intended to "do 1.15 on the EPV." Through testimony presented at trial, it was understood that Defendant intended to sell the available shares of EPV Solar stock to

13

the six members of the YPO for $1.15 per share, despite the fact that, at that time, he was also circulating the first iteration of the fraudulent valuation of EPV Solar at $2.88 per share. See Gov.'s Trial Ex. A-77, Jan. 23, 2009 (email from Defendant forwarding Lynch's revised valuation of EPV Solar at $2.88 per share); Gov.'s Trial Ex. A-82, Jan. 28, 2009 (email from Defendant circulating Lynch's signed valuation of EPV Solar at $2.88 per share on Salem Financial letterhead).

On February 3, 2009, Defendant sent Glasser another email in anticipation of a sales call the next day concerning the YPO buyers. In that email, Defendant asks that Glasser remind the YPO buyers that the $1.15 per share price for EPV Solar stock was a "deal" in light of the fact that "we [Defendant and Glasser] have it at [$]2.88." Gov.'s Trial Ex. A-96. On February 4, 2009, Defendant circulated another email setting forth the terms for an anticipated sale of EPV Solar stock which would yield approximately $335,000.00 in transaction fees for those associated with MICG. On February 6, 2009, Michael Feldman ("Feldman"), who at the time was Chief Financial Officer ("CFO") for MICG, sent Defendant an email indicating that he had shown the February 4, 2009 email detailing the sale to Umscheid, an independent auditor with Harbinger, PLC. According to Feldman, Umscheid stated that he "hope[s] the [EPV Solar] shares are being sold at $2.88." Gov.'s Trial Ex. A-99. At trial, Feldman explained that Umscheid had so remarked because he was concerned that Defendant was selling the shares for a lesser price, despite the fact that he had secured a valuation for EPV Solar at $2.88 per share just a few weeks earlier.

Notwithstanding Umscheid's concerns, Defendant proceeded to broker a sale of EPV Solar stock at $1.15 per share, well below the share price he was representing to Venture Strategies Fund investors at this time to justify his fees. Giffis served as the Agent of the selling

shareholders in conducting the sale of their EPV Solar stock to Defendant, which in turn would be purchased by the YPO buyers. On February 26, 2009, Giffis sent Glasser an email representing that Giffis accepted MICG Ventures, LLC's subscription for 900,100 shares of EPV Solar common stock, to be purchased at $1.15 per share. Gov.'s Trial Ex. A-111. Defendant did not, however, purchase those shares through the Venture Strategies Fund. Rather, MICG Ventures, LLC was an omnibus account through which this transaction would occur. Funds were initially transmitted from MICG Ventures, LLC to Giffis, who in turn transmitted the 900,100 shares of EPV Solar common stock. Defendant then sold those 900,100 shares to the YPO buyers at $1.15 per share, and collected a transaction fee thereon. Defendant's involvement with this transaction was evidenced by the "Offer to Purchase Securities" form, attached to Giffis's February 26 email, which Defendant signed, that offers to purchase EPV Solar stock from an existing shareholder. Gov.'s Trial Ex. A-111, at 3.

This transaction did not, however, deter Defendant from advertising Lynch's fraudulent $2.88 valuation of EPV Solar stock amongst the Venture Strategies Fund's clientele. For instance, on February 27, 2009, just one day after signing a document arranging the sale of EPV Solar stock at only $1.15 per share, Defendant circulated a letter providing an update on the performance and happenings of MICG's three hedge funds. Gov.'s Trial Ex. A-112. Amongst other things, Defendant stated that, for 2008, the Venture Strategies Fund had risen 16.98 percent in value. Gov.'s Trial Ex. A-112. That increase was based on Lynch's fraudulently-obtained $2.88 valuation, and Defendant made no effort to disclose or account for the fact that the day earlier he had arranged a sale of EPV Solar common stock for only $1.15 per share the day prior.

### C.   THE GOVERNMENT INTRODUCED SUFFICIENT EVIDENCE TO SUPPORT DEFENDANT'S CONVICTIONS ON COUNTS 1 AND 6-14

Defendant moves the Court to enter Judgment of Acquittal on Counts 1 and 6-14, arguing that there was insufficient evidence of false or fraudulent conduct to support conviction on each of those counts. Def.'s Mot. for J. of Acq. & New Trial 2-3, ECF No. 100. For the reasons set forth in this subsection, the Court **DENIES** Defendant's Motion for Judgment of Acquittal with respect to Counts 1 and 6-14.

Defendant argues that "[r]egardless as to who may have proposed the number or values, Lynch was unequivocal in in [sic] testifing [sic] that it was his call to make and he had the absolute discretion" to reject the $2.88 per share valuation of EPV Solar. Def.'s Mot. for J. of Acq. & New Trial 2, ECF No. 100. Defendant's argument ignores that Lynch was led to believe these valuations were for the personal use of EPV Solar's Chair, not for Defendant's use in justifying the management and incentive fees he withdrew from the Venture Strategies Fund's account at First Clearing. In fact, when Gifis first approached Lynch at Defendant's behest, Lynch stated that he "was incapable of providing a professional valuation of . . . [EPV Solar] due to its complexity." According to Lynch's testimony, he told Gifis that a professional valuation would require accounting firms, auditors, law firms, etc. He was neither prepared, nor qualified, to perform a valuation of EPV Solar which would then be used to value the privately-held assets of a hedge fund. Thus, Lynch unequivocally stated that it would be inappropriate for anyone to use his valuations to value the privately-held assets of the Venture Strategies Fund.

Viewing the evidence in the light most favorable to the Government, the Court finds that Defendant knew Lynch was not qualified to perform an independent valuation of EPV Solar's assets. Defendant authored inflated valuations for his personal benefit and transmitted them for Lynch's approval, knowing that Lynch was approving those valuations under false pretenses. In

16

essence, Defendant knew Lynch had been duped into serving as a rubber stamp for the valuations Defendant authored, but nonetheless chose to use those valuations in justifying his fees and marketing the Venture Strategies Fund to new investors. There is no doubt that Defendant knew that these fraudulently-obtained valuations were inflated—Defendant was arranging sales of EPV Solar stock to the YPO buyers for considerably less than the valuations he touted before the Venture Strategies Fund's clientele and potential investors.

Under these circumstances, the Court **FINDS** that the Government presented sufficient evidence such that a reasonable juror could find, beyond a reasonable doubt, that Defendant made false or fraudulent representations, in that he used the Lynch-approved valuations with reckless disregard as to their truthfulness. The Court, therefore, **DENIES** Defendant's Motion for Judgment of Acquittal with respect to Counts 1 and 6-14. Def.'s Mot. for J. of Acq. & New Trial 2-3, ECF No. 100.

### D.    DEFENDANT'S CONVICTIONS ON COUNTS 17-23 AND THE "MERGER PROBLEM"

Defendant argues that the Government failed to present sufficient evidence that the monetary transactions underlying Counts 17-23 involved the "net profits" of his fraudulent scheme, as is allegedly required by United States v. Santos, 553 U.S. at 507, and its progeny, see Def.'s Mot. for J. of Acq. & New Trial 3, ECF No. 100.

In Part II(B)(1) of this Opinion and Order, the Court will discuss the standard of review which applies to each of Defendant's counts of conviction under 18 U.S.C. § 1957. The Court finds, on the basis of that discussion, that Counts 17-23 must be analyzed pursuant to the definition of "proceeds" which controlled prior to May 20, 2009, the date on which the Fraud Enforcement and Recovery Act of 2009 ("FERA") took effect, Pub. L. No. 111-21, 123 Stat. 1617-31 (2009). Having identified the governing standard of review, in Part II(B)(2) the Court

17

will consider the so-called "merger problem" as it relates to each of Counts 17-23.  Based on its analysis in Part II(B)(2), the Court: (1) **DENIES** Defendant's Motion for Judgment of Acquittal on Counts 17-18 and 20-23; but (2) **GRANTS** Defendant's Motion for Judgment of Acquittal on Count 19.

      1.     **Standard of Review**

          a.     The "Merger Problem" and the Pre-FERA Two-Step Analysis

Section 1957 of Title 18 provides that whoever, in the United States, "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity," commits an offense against the United States.  18 U.S.C. § 1957(a)-(b).  "Criminally derived property" is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense."  18 U.S.C. § 1957(f)(1) (emphasis added).  Prior to May 20, 2009, § 1957 did not define the term "proceeds."[1]  As a result, confusion arose as to whether Congress intended "proceeds" to be interpreted as gross receipts or net profits.

The Supreme Court confronted that confusion in United States v. Santos, 553 U.S. at 507.  The defendant in Santos operated an illegal gambling operation from the mid-1970s until 1994.  The defendant employed "runners" at bars and restaurants who "gathered bets from gamblers, kept a portion of the bets (between 15% and 25%) as their commissions, and delivered the rest" to collectors.  Those collectors would then deliver the money to the defendant, who would use the money to pay collector salaries and reimburse winners.  Defendant was charged and

---

[1] As discussed below, Congress has since amended the statute.  Effective May 20, 2009, § 1957 provides that the term "proceeds" shall have the meaning set forth at 18 U.S.C. § 1956.  18 U.S.C. § 1957(f)(3); see also Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 2(f)(2), 123 Stat. 1618 (2009) (amending § 1957 to provide definition of "proceeds" by reference to 18 U.S.C. § 1956).  As set forth in 18 U.S.C. § 1956, "proceeds" is now defined as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity."  18 U.S.C. § 1956(c)(9) (emphasis added); see also Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 2(f)(1), 123 Stat. 1618 (2009) (amending § 1956(c) to provide definition of "proceeds").

convicted of, amongst other things, two counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).  Thereafter, the <u>Santos</u> defendant collaterally attacked his money-laundering convictions, arguing "that the money-laundering statute's prohibition of transactions involving criminal 'proceeds' applies only to transactions involving criminal profits, not criminal receipts." <u>Id.</u> at 509.

The Supreme Court agreed.  Writing for four justices, with Justice Stevens concurring, Justice Scalia found in Part II of the plurality opinion that no definition of "proceeds" could be discerned from the face of the statute.  In such circumstances, "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." <u>Id.</u> at 514 (citing <u>United States v. Bass</u>, 404 U.S. 336, 347-49 (1971); <u>McBoyle v. United States</u>, 283 U.S. 25, 27 (1931); <u>United States v. Gradwell</u>, 243 U.S. 476, 483 (1917)).  The plurality, therefore, held that "proceeds," as used in § 1956, should be defined as profits rather than receipts, because the profits interpretation is more defendant-friendly.  <u>Id.</u>  However, Justice Stevens only concurred in the Judgment.  <u>Id.</u> at 524-28 (Steven, J., concurring).  Thus, though Justice Stevens agreed that "proceeds" must be interpreted as "profits" when the predicate offense under § 1956 is illegal gambling, that interpretation did not extend to other predicate offenses under § 1956.

In Part III of the plurality Opinion, Justice Scalia further explained that defining "proceeds" as profits was necessary to avoid the so-called "merger problem":

> If "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery.  Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would "merge" with the money-laundering statute.

<u>Id.</u> at 515-16.  The plurality further warned that

> [t]he merger problem is not limited to lottery operators. For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime. Few crimes are entirely free of cost, and costs are not always paid in advance.

Id. at 516. The plurality opinion interpreted "proceeds" to mean profits so as to avoid this "merger problem." Id.; see also Santos, 553 U.S. at 527 (Stevens, J., concurring) (stating that the merger problem, which would allow "the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy").

The Fourth Circuit has further developed the standard of review which applies when a court must confront the merger problem under 18 U.S.C. §§ 1956 and 1957. In United States v. Halstead, the Circuit addressed the merger problem in the context of healthcare fraud. 643 F.3d 270 (4th Cir. 2011). The defendant in Halstead established a parent company, which in turn managed two subsidiaries—a medical clinic and chiropractic center. Id. at 272. To exploit patient healthcare benefits, a doctor at the medical clinic would fraudulently prescribe chiropractic services to patients, thereby acting as a rubber stamp for the chiropractic clinic. Id. at 272-73. The medical clinic would bill all services to the health insurance companies and receive payment into its accounts. The money was then transferred from the medical clinic to the parent company's account, and then transferred again from the parent company to the defendant's personal account. Id. at 273.

The defendant in Halstead was convicted of health care fraud, in violation of 18 U.S.C. § 1347, and conspiracy to launder money, in violation of 18 U.S.C. § 1956(a). Thereafter, the defendant collaterally attacked his money-laundering conviction, arguing that the transactions underlying his healthcare fraud and money-laundering convictions were the same, thereby raising the merger problem. The Fourth Circuit disagreed. The Halstead opinion evidences the

importance of examining the charged conduct, predicate offense, and specifics of each transaction in determining whether the merger problem arises. In <u>Halstead</u>, the Circuit found that the healthcare fraud transactions were separate and distinct from those underlying the money-laundering convictions. The healthcare fraud concerned fund transfers from the health insurance companies to the medical clinic, and was complete the moment the funds entered the medical clinic's account. The money-laundering charges were based on the defendant's subsequent transfers from the medical clinic, through the parent company, to his personal account. Since no merger problem arose, the Government was not required to show that the monetary transactions serving as the basis for the § 1956 conviction concerned "net profits." <u>Id.</u> at 280-281.

Two years later, in <u>United States v. Robertson</u>, the Fourth Circuit addressed the merger problem in the context of mortgage fraud. No. 11-4529, 2013 WL 870633 (4th Cir. Mar. 11, 2013) (per curiam) (unpublished decision). The defendant in <u>Robertson</u> was charged with, amongst other things, wire fraud, mail fraud, and three counts of engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957. <u>Id.</u> at *1. In considering the defendant's challenge to the three § 1957 convictions, the Fourth Circuit "read <u>Santos</u> to stand for the proposition that when a defendant is charged with money laundering <u>and</u> there is a merger problem with the predicate offense," a court must determine "the proper definition of proceeds 'on a case-by-case approach.'" <u>Id.</u> at *4 (citing <u>Santos</u>, 553 U.S. at 279). "If a merger problem exists with respect to any of the counts, the definition of 'proceeds' should be narrowed to encompass only 'actual profits' when the predicate crime is mortgage fraud." <u>Id.</u>

The Fourth Circuit found that no merger problem arose with respect to two of the money-laundering convictions, but found it necessary to reverse on the third. First, count 13 involved a transfer from a straw buyer to the defendant. The Circuit explained that no merger problem arose in count 13 because, rather than "pay anyone for their part in the crime," the defendant had helped herself to the proceeds of the fraud. Id. at *5 (citing United States v. Cloud, 680 F.3d 396, 399 (4th Cir. 2012)). Count 15 concerned a wire transfer from a title company to an intermediary's account. No merger problem arose because the evidence at trial showed the Robertson defendant frequently used that intermediary account for her own purposes, such as to buy furniture or clothes. Id. The Fourth Circuit did, however, reverse the Robertson defendant's conviction on count 14, which involved a wire transfer to an intermediary account. The Circuit found that the merger problem arose because the record was silent as to the defendant's relationship with that intermediary, and reversed because no evidence of net profits was offered at trial. Id. at *6.

Finally, in United States v. Abdulwahab, the Fourth Circuit addressed the merger problem in the context of investment fraud. No. 11-5093, 2013 WL 1789741 (4th Cir. Apr. 29, 2013). The defendant in Abdulwahab owned and operated a company—HIC—which served as the marketing arm to another company—A & O—that sold life settlement investments. The defendant became a partner in A & O, after which A & O established hedge funds. A & O offered fractionalized interests in those funds to investors, which were deemed "capital appreciation bonds." HIC continued to serve as the marketing arm for A & O's sale of "capital appreciation bonds," attracting new investors through use of marketing materials containing misrepresentations. The Abdulwahab defendant was convicted of mail fraud conspiracy, mail fraud, money laundering conspiracy, money laundering, and securities fraud. Id. at *1-3.

The defendant moved for judgment of acquittal on each money-laundering count, arguing that they suffered from the merger problem because the underlying transactions involved commission payments to HIC employees for their sale of A & O products. The Fourth Circuit agreed and reversed all of the <u>Abdulwahab</u> defendant's money-laundering convictions. <u>Id.</u> at *4, *6-9. The Court found that the merger problem arose because the transfers "played a critical role in the underlying fraud scheme in that it was the promise of payment for services rendered that enticed HIC [and the sales agent] . . . to obtain investors for A & O." <u>Id.</u> at *8.

      b.   <u>The Pre-FERA Standard of Review Governs the Court's Analysis of Counts 17-23</u>

Prior to May 20, 2009, 18 U.S.C. §§ 1956 and 1957 did not define the term "proceeds." It was confusion concerning that term which led to discussion of the so-called "merger problem" in <u>Santos</u> and its progeny. <u>See</u> <u>supra</u> Part II(D)(1)(a). On May 20, 2009, however, the President signed into law the Fraud Enforcement and Recovery Act of 2009 ("FERA"). FERA amended 18 U.S.C. §§ 1956 and 1957 by defining the term "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." Fraud Enforcement and Recovery Act of 2009, sec. 2(f)(1)(B) & (2), § 1956, 123 Stat. 1618 (2009) (setting forth definition of proceeds at § 1956, and defining the term in § 1957 by reference to § 1956).

FERA did not expressly provide a date on which the amendments to 18 U.S.C. §§ 1956 and 1957 take effect.[2] Thus, the Court must resort to the "general rule that when a statute has no effective date, 'absent a clear direction by Congress to the contrary, [it] takes effect on the date of its enactment.'" <u>Johnson v. United States</u>, 529 U.S. 694, 702 (2000) (quoting <u>Gozlon-Peretz</u>

---

[2] Section 4(f) of FERA does provide an "effective date and application." Fraud Enforcement and Recovery Act of 2009, sec. 4(f), § 3729 note, 123 Stat. 1625 (2009). However, that provision only applies to "amendments made <u>by this section</u>"—i.e., Section 4 of FERA. The amendments to 18 U.S.C. §§ 1956 and 1957 are found in Section 2 of FERA, which is silent with respect to an effective date.

v. United States, 498 U.S. 395, 404 (1991)).   There is nothing in the legislative history evidencing Congress's intent that those amendments apply retroactively.   See generally S. Rep. No. 111-10 (2009), reprinted in 2009 U.S.C.C.A.N. 430.   The Court, therefore, finds that FERA's amendments to 18 U.S.C. §§ 1956 and 1957 took effect on May 20, 2009.   See United States v. Moreland, 604 F.3d 1058, 1074 n.4 (9th Cir. 2010); United States v. Bueno, 585 F.3d 847, 853 n.4 (5th Cir. 2009) ("The bill is silent on retroactivity; therefore, it only applies to conduct which occurs post-amendment.")

That date is relevant because the transactions underlying Defendant's § 1957 convictions, set forth in Counts 17-23 of the Indictment, ECF No. 1, occur both before and after May 20, 2009.   Counts 17-20 are undoubtedly governed by the pre-FERA definition of "proceeds," as those counts are premised on monetary transactions occurring prior to May 20, 2009.   Indictment 21-22, ECF No. 1.   But, Defendant's convictions on Counts 21-23 are premised on transactions occurring from May 28, 2009 to July 1, 2009.   Indictment 22, ECF No. 1.   The Court must, therefore, ascertain whether the pre- or post-FERA standard of review controls with respect to Counts 21-23.

The Court finds that the pre-FERA standard governs its analysis of Counts 21-23. Section 1957 criminalizes knowingly engaging, or attempting to engage in, a monetary transaction in criminally derived property of a value greater than $10,000 which is derived from specified unlawful activity.   The term "criminally derived property" means "property constituting, or derived from, proceeds obtained from a criminal offense."   18 U.S.C. § 1957(f)(2) (emphasis added).

To apply the post-FERA definition of "proceeds," all elements of the offense must be satisfied by conduct occurring on or after FERA's enactment.   This is only possible if the

proceeds involved in Counts 21-23 were "obtained from a criminal offense" on or after May 20, 2009. Counts 21-23 concern wire transfers from the Venture Strategies Fund's account at First Clearing on: (1) May 28, 2009; (2) June 11, 2009; and (3) July 1, 2009. Indictment, ECF No. 1. But, the First Clearing account did not receive any funds from investors—i.e., "proceeds obtained from a criminal offense," 18 U.S.C. § 1957(f)(2)—from May 11, 2009 to February 22, 2010. See Gov.'s Ex. D-10, at 5-6 (referencing $50,000 received from Mark Brunn on May 11, 2009 and $50,000 received from David K. Lehnertz on February 22, 2010). Therefore, to satisfy the elements of the offense in Counts 21-23, the Government must rely on "proceeds" obtained prior to May 20, 2009. Accordingly, the Court finds that the pre-FERA standard of review also controls its analysis of Counts 21-23, notwithstanding the fact that the transfers themselves occurred after FERA's enactment.

### 2. Discussion

Applying the pre-FERA standard of review, the Court finds that the merger problem does not arise with respect to Defendant's convictions on Counts 17, 18, or 20-23 because the funds underlying those transactions were not used to pay any essential expense of the "specified unlawful activity"—mail and/or wire fraud—but, rather, were directed for Defendant's personal use. The Court does, however, find that the merger problem arises with respect to Count 19, and that the Government failed to present evidence of "net profits" on that count. Therefore, the Court: (1) **DENIES** Defendant's Motion for Judgment of Acquittal on Counts 17, 18, and 20-23; but (2) **GRANTS** Defendant's Motion for Judgment of Acquittal on Count 19.

#### a. The Funds Underlying Counts 17, 18, and 20-23 Were Not Used to Pay Any Essential Expense of the Predicate Mail and/or Wire Fraud

Defendant was convicted in Counts 17-23 of engaging in monetary transactions involving proceeds derived from "specified unlawful activity." The Indictment provides that such

"specified unlawful activity" was "Wire Fraud and/or Mail Fraud." Indictment 21, ECF No. 1. The merger problem only arises if Defendant used the proceeds in Counts 17-23 to pay an essential expense of the predicate mail and/or wire fraud. The Court **FINDS** that no merger problem arises with respect to Counts 17, 18, and 20-23 because the underlying funds were not used to pay any essential expense of the predicate mail and/or wire fraud.

Defendant's convictions on Counts 17, 18, and 20-23 are easily distinguished from other cases where courts have found that the merger problem arose. In Santos, the Supreme Court found the merger problem arose "because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery." 553 U.S. at 515-16. Defendant's case would be analogous to Santos if the funds in Counts 17, 18, and 20-23 were directed toward paying redemption requests of the Venture Strategies Fund's existing investors. This was not the case. As set forth in Government's Trial Exhibit D-10, redemption requests were paid out of the Venture Strategies Fund's account at First Clearing. Counts 17, 18, and 20-23 involve transactions that actually withdrew money from that First Clearing account and transferred it to either: (1) an MICG account at RBC Bank; (2) RBC Bank; or (3) Defendant's personal account. As explained below, these transfers were directed for Defendant's personal use, not to pay any essential expense of the "specified unlawful activity"—mail and/or wire fraud—by which the proceeds in Counts 17, 18, and 20-23 were derived.

Defendant's convictions on Counts 17, 18, and 20-23 are also distinguishable from the facts of Abdulwahab. In Abdulwahab, the Fourth Circuit found that the merger problem arose because "it was the promise of payment for services rendered that enticed HIC [and the sales agent] . . . to obtain investors for A & O." Id. at *8. Defendant's case would be analogous to Abdulwahab if the funds underlying Counts 17, 18, and 20-23 were used to pay Glasser, Gifis, or

26

Lynch for their involvement in securing the fraudulent valuations of EPV Solar. There is no evidence that Defendant compensated Glasser, Gifis, or Lynch for their involvement in procuring those valuations. Therefore, no merger problem arises because the proceeds in Counts 17, 18, and 20-23 were not used by Defendant to compensate his co-conspirators for their involvement in the predicate mail and/or wire fraud.

Defendant's case is more akin to Halstead and Robertson. In Halstead, the defendant conspired to commit healthcare fraud. The fraudulently-obtained funds were received into the account of a medical subsidiary, which the defendant would then transfer through a parent company to his personal accounts. The Fourth Circuit found no merger problem arose because the transfers were directed for the defendant's personal use rather than payment of the essential expenses of the predicate offense of healthcare fraud. Halstead, 643 F.3d at 280-281. Similarly, in Robertson, the Fourth Circuit found no merger problem arose where, rather than paying anyone for their part in the crime, the transfers were directed for the defendant's personal use. This included a transfer to an intermediary account which the evidence had established that the Robertson defendant frequently used for her own purposes, such as to buy furniture or clothes. Robertson, 2013 WL 870633, at *5.

Defendant argues that the funds in Counts 17, 18, and 20-23 were used to pay "weekly net capital, salaries, office rental, etc." Def.'s Mot. for J. of Acq. & New Trial 3, ECF No. 100. To understand why this argument fails, the Court must first explain the structuring of Defendant's fraud and, more generally, his brokerage firm. As set forth in Government's Trial Exhibit D-1C, the ownership structure for Defendant's company was:



See Gov.'s Trial Ex. D-1C.  MICG Investment Management, LLC was the fund manager for the

Venture Strategies Fund.  See Gov.'s Trial Exhibit B-1, at 1-2 (setting forth Confidential Private

Placement Memorandum for MICG Venture Strategies, LLC).  Defendant was the sole manager

of MICG Investment Management, LLC, which in turn managed the Venture Strategies Fund.

As the sole manager, Defendant exercised total control over the Venture Strategies Fund's

operations and was entitled to a 1 percent annual management fee (paid in quarterly increments)

and 20 percent incentive fee (paid annually).  It was through MICG Investment Management,

LLC that the predicate mail and/or wire fraud was accomplished.

Insofar as there may have been any essential expenses of predicate fraud, it was limited to

either paying (1) Defendant's co-conspirators for their involvement in securing fraudulent EPV

Solar valuations; or (2) redemption requests from existing investors, so as to encourage new

investment and deter investigation.  The evidence shows that the funds underlying Counts 17, 18,

and 20-23 were not used to pay such expenses and, therefore, no merger problem arises.

Count 22 concerns a transfer from the Venture Strategies Fund's First Clearing account

to Defendant's personal account.  Clearly no merger problem arises where criminally-derived

proceeds were directly deposited into Defendant's personal account.

Similarly, Counts 17, 18, 20-21, and 23 concern proceeds directed for Defendant's personal use. The "weekly net capital, salaries, office rental, etc." referenced in Defendant's Motion was not an essential expense of the predicate fraud. That fraud was perpetrated through MICG Investment Management, LLC, which served as fund manager for the Venture Strategies Fund, which in turn had an account at First Clearing. Defendant would transfer fraudulently-obtained funds from that First Clearing account to accounts at RBC, from which he paid the skyrocketing operating expenses for other parts of his brokerage firm. In essence, Defendant was diverting money obtained through fraudulent means from one part of his business to pay the skyrocketing expenses of a separate and distinct part of his business. On these facts, the Court finds that the property underlying Counts 17, 18, 20-21, and 23 were truly directed for Defendant's personal use rather than to pay any essential expense of the predicate fraud.

That finding is bolstered by evidence that Defendant used those RBC accounts for his personal use. See Robertson, 2013 WL 870633, at *5 (finding no merger problem arose where the evidence showed a defendant used an intermediary account as her own to buy items such as clothing and furniture). For example, trial testimony showed that Defendant leased, through MICG, a Bentley automobile valued at approximately $170,000 from January 2007 to January 2010. The lease payment of $3,700 was paid in both January and February 2009. Thus, it appears Defendant used no less than $7,400 of the fraudulently-obtained funds transferred into the MICG account at RBC to lease a luxury automobile for his personal use. This is just one of many examples where Defendant used business accounts to finance his lavish lifestyle. Defendant threw Christmas parties costing approximately $30,000 where, in addition to co-workers and clients, he would invite his friends. Defendant was also withdrawing $40,000 per

month from MICG's account as his principal income. Luxury automobiles, fancy parties, and a generous monthly salary do not constitute essential expenses of Defendant's predicate mail and/or wire fraud.

    b. <u>Defendant's Conviction on Count 19 Must Be Reversed, as the Merger Problem Arises and the Government Failed to Offer Evidence of Net Proceeds</u>

  The Court reaches a different conclusion with respect to Count 19. Count 19 is premised on a transfer of $50,713.38 from the Venture Strategies Fund's First Clearing account to "K.T." on February 25, 2009. "K.T." stands for Kenny Taylor. <u>See</u> Indictment 21-19, ECF No. 1; Gov.'s Trial Exhibit D-10, at 4 (entry dated February 25, 2009). The evidence presented at trial showed that Kenny Taylor was an investor who held a position of approximately $100,000 in the Venture Strategies Fund. The $50,713.38 transfer satisfied a redemption request placed by Mr. Taylor.

  The Court finds that the funds underlying Count 19 were directed at paying an essential expense of the predicate mail and/or wire fraud. In <u>Santos</u>, the Supreme Court found that the merger problem arose where the property underlying the defendant's money-laundering transactions were used to pay winners of the defendant's illegal gambling operation. This was because few, if any, lotteries would not pay their winners. Similarly, few, if any, investment fraud schemes would wholly refuse to pay redemption requests of existing investors. News of unfulfilled requests would scare off new investors and attract unwanted attention from investigators. The Court, therefore, finds that the merger problem arises with respect to Count 19 because the funds underlying that count were directed at paying an essential expense of the predicate fraud.

Having found that the merger problem arises with respect to Count 19, the Court must next determine whether the Government presented sufficient evidence that the money involved constituted the net profits of Defendant's mail and/or wire fraud. The Government did not present evidence concerning net profits during the course of trial. The Court, therefore, **FINDS** that the Government presented insufficient evidence to sustain Defendant's conviction on Count 19 and **GRANTS** Defendant's Motion for Judgment of Acquittal on Count 19. Def.'s Mot. for J. of Acq. & New Trial, ECF No. 100.

E.    **DEFENDANT IS NOT ENTITLED TO A MOTION FOR JUDGMENT OF ACQUITTAL ON COUNTS 3-5, 24, AND 26, WHICH THE JURY COULD NOT AGREE ON**

The jury began its deliberations on May 2, 2013. On May 6, 2013, the jury foreman advised the Court that the jury could not reach a verdict on Counts 3-5, 24, and 26. The Court then declared a mistrial with respect to Counts 3-5, 24, and 26. Defendant now argues that the Court should grant his Motion for Judgment of Acquittal on Counts 3-5, 24, and 26 because no reasonable trier of fact could conclude guilt beyond a reasonable doubt as to those counts.

Prior to the jury beginning its deliberations, the Court found that the Government had presented sufficient evidence to refer Counts 3-5, 24, and 26 to the jury. The jury's inability to reach a verdict on those counts does not change that finding. As the Supreme Court explained in Arizona v. Washington, the "classic basis for a proper mistrial" is "the trial judge's belief that the jury is unable to reach a verdict." 434 U.S. 497, 509 (1978). Under such circumstances, a defendant may be required to submit to a second trial on those counts. Id. The Court acted properly in declaring a mistrial with respect to Counts 3-5, 24, and 26, and its finding that there was sufficient evidence to refer those counts to a jury remains valid. The Court, therefore, **DENIES** Defendant's Motion for Judgment of Acquittal on Counts 3-5, 24, and 26.

III.   **DEFENDANT'S MOTION FOR NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33**

Defendant also moves, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, for a new trial based on comments made by witnesses relating to a Financial Industry Regulatory Authority ("FINRA") investigation of Defendant's brokerage firm.  For the reasons set forth in this Section, the Court **DENIES** Defendant's Motion for New Trial.  ECF No. 100.

A.   STANDARD OF REVIEW

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Unless grounded on newly discovered evidence, a motion for new trial "must be filed within 14 days after the verdict or finding of guilty."  Fed. R. Crim. P. 33(b)(2).  In considering a motion for new trial, the Fourth Circuit has stated that a district court should exercise its discretion "sparingly," and should grant such motion "only when the evidence weighs heavily against the verdict."  United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003) (internal quotation marks omitted) (quoting United States v. Wilson, 118 F.3d 228, 237 (4th Cir. 1997)), cert. denied, 540 U.S. 1185 (2004).

B.   DISCUSSION

Prior to his criminal trial, Defendant's fraudulent activities were investigated by FINRA. Defendant entered into a settlement agreement with FINRA, by which he substantially admitted to the fraud alleged in Counts 1-23 of the Indictment.  As a result of that investigation, Defendant's brokerage firm closed and Defendant surrendered his license to sell securities.  Prior to trial, the parties agreed that they: (1) could reference the FINRA investigation during the course of trial; but (2) would not reference the settlement agreement reached between Defendant and FINRA, in which he agreed to surrender his broker's license.  That agreement was based on

32

uncertainty as to the FINRA settlement's admissibility under Rule 408(a)(1) of the Federal Rules of Evidence.

Defendant now moves the Court, pursuant to Rule 33(a), for a new trial. Defendant argues that despite the agreement concerning the FINRA settlement, "witnesses were allowed to testify to, not the fact or that a settlement was reached, but to the results of the settlement." Def.'s Mot. for J. of Acq. & New Trial 4, ECF No. 100. Defendant claims that "[t]he introduction of the FINRA results so compromised the defendant's right to be tried upon the evidence presented in the courtroom . . . as to preclude his rights to a fair trial." Def.'s Mot. for J. of Acq. & New Trial 4, ECF No. 100.

The verdict was returned on May 6, 2013. Jury Verdict, ECF No. 92; see also Min. Entry, May 6, 2013, ECF No. 91. Defendant filed his Motion for Judgment of Acquittal and New Trial on May 20, 2013. ECF No. 100. The Court **FINDS** that Defendant's Motion for New Trial is timely filed and will proceed to consider said Motion on the merits. In doing so, the Court **FINDS** that Defendant's right to a fair trial was not prejudiced by introduction of evidence concerning the outcome of the FINRA investigation and **DENIES** Defendant's Motion for New Trial. Def.'s Mot. for J. of Acq. & New Trial 4, ECF No. 100.

As an initial matter, the Court would note that Defendant is as much responsible for the introduction of testimony concerning the closing of Defendant's investment firm and the loss of his brokerage license as the Government. In his opening statement, defense counsel acknowledged that Defendant's investment firm had to close its doors. Defendant's counsel further claimed that Defendant's investment firm flourished and, "but for the significant financial downturns in the market in 2008," would have continued flourishing. That opening statement was consistent with Defendant's strategy throughout trial. Through direct examination, cross

examination, and even his own testimony, Defendant sought to portray himself as a victim.
Defendant tried to convince the jury that it was not his fraudulent activities that led to the closing
of his investment firm and revocation of his brokerage license. Rather, he argued that he was a
victim of the economic downturn. Defendant's counsel continued to make reference to the
results of the FINRA investigation in his closing argument, emphasizing to jurors that neither
"the fact that his [Defendant's] business closed" nor "the fact that he [Defendant] no longer has a
license" is evidence of criminal conduct. Defendant, therefore, made the reason for his firm's
closure a central theme and repeatedly brought up the "results" of the FINRA investigation
throughout trial. It is in this context that the Court must assess Defendant's dissatisfaction with
witness testimony concerning the closing of Defendant's brokerage firm and revocation of
Defendant's brokerage license.

The Court finds that Defendant did not suffer any prejudice from testimony referencing
the aforementioned results of the FINRA investigation. Defendant appears to take issue with
testimony offered by Mark Selden, the CEO of a telecommunications company in New York
City, who testified on Tuesday, April 16, 2013. Seldon was one of many investors in the
Venture Strategies Fund victimized by Defendant's fraudulent activities. During the course of
direct examination, the Government inquired as to whether Seldon ever consulted with
Defendant concerning the closure of Defendant's brokerage firm. Mr. Seldon answered in the
affirmative, and explained that Defendant "blamed it on Bernie Madoff and New York City.
That he was in the wrong business at the wrong time, but that he did nothing wrong, and that . . .
[Mr. Seldon's] money in the fund was still there."[3] Seldon further acknowledged that he was

---

[3] William B. Carper, Jr., another investor with Defendant's brokerage firm, testified that Defendant offered
a similar explanation with respect to "examinations" of Defendant's hedge funds. Mr. Carper did not, however,
make any reference to the FINRA investigation as it relates to the closing of Defendant's brokerage firm or the loss
of his brokerage license.

34

still a client when Defendant's brokerage firm shut down. The Government inquired as to how he learned that Defendant's brokerage firm shut down, and Seldon explained that he received a letter from FINRA stating that they were revoking Defendant's brokerage license and he would need to move his investments to a different clearing house.

Defendant's counsel did not object to any of those questions when they were being asked. Defendant's counsel did not object to that line of questioning prior to engaging the witness in cross-examination. In fact, Defendant's counsel did not object to that line of questioning on the day it occurred. It was not until the opening of trial on Wednesday, April 17, 2013, that Defendant's counsel first expressed concern about Mr. Seldon's testimony. Defendant did not move for a mistrial at that time. Rather, defense counsel requested an instruction cautioning the jurors to disregard "any comments by the witness involving the results of a FINRA investigation." The Government stated its opposition to the requested instruction.

Though Defendant's objection to the testimony was untimely, out of an abundance of caution, the Court instructed the jury that "[a]ny investigation by any other entity or body is not before you [the jury] and, therefore, should not be considered in this case." The Court did, however, advise the jury that they could "consider the fact that the defendant's organization was put out of business—was out of business." But, the Court stressed that "[w]hat caused that is not before you." Contrary to what is set forth in Defendant's Motion for New Trial, defense counsel did not object to the content of that instruction when it was given. Having so instructed the jury, the Court directed the Government to proceed with its next witness.

Defendant now moves the Court for a new trial, alleging that Seldon's testimony concerning the contents of the letter he received from FINRA compromised Defendant's right to be tried upon the evidence presented in the courtroom. Defendant repeatedly failed to raise

timely objections to that testimony. If it was truly prejudicial to Defendant's rights, then defense counsel should have raised timely objections to that line of questioning and/or the Court's curative instruction.

More generally, Defendant cannot credibly claim that he was prejudiced by the introduction of facts concerning the results of the FINRA investigation, as those results are inextricably intertwined with his fraudulent activities. The Indictment makes express reference to those results, having provided that "[o]n or about May 12, 2010, MICG ceased active operations. Subsequently, MARTINOVICH [Defendant] surrendered his broker's license." Indictment 11, ECF No. 1. The Court stated that it was providing a copy of the Indictment to the jury for use during its deliberations. Defendant's counsel did not object to the jury's review of the Indictment. Moreover, as set forth above, defense counsel made reference to the FINRA results during his opening and closing arguments. Defendant's counsel also saw fit to introduce dozens of pages of sworn testimony before FINRA investigators in an effort to discredit a key Government witness. On these facts, the Court **FINDS** that Defendant was not prejudiced by the introduction of testimony concerning the results of the FINRA investigation. Those results were part-and-parcel to his crimes and, more often than not, defense counsel was responsible for the results being referenced. The Court, therefore, **DENIES** Defendant's Motion for New Trial. Def.'s Mot. for J. of Acq. & New Trial 4, ECF No. 100.

## IV.  CONCLUSION

For the reasons set forth herein, the Court: (1) **DENIES** Defendant's Motion for Judgment of Acquittal with respect to his convictions on Counts 1, 6-9, 10-14, 17-18, and 20-23; (2) **GRANTS** Defendant's Motion for Judgment of Acquittal with respect to his conviction on Count 19; (3) **DENIES** Defendant's Motion for Judgment of Acquittal with respect to Counts

3-5, 24, and 26, which the jury could not agree on; and (4) **DENIES** Defendant's Motion for New Trial.  Def.'s Mot. for J. of Acq. & New Trial, ECF No. 100.  The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to all Counsel of Record.

      **IT IS SO ORDERED**.

/s/
Robert G. Douman
Senior United States District Judge

UNITED STATES DISTRICT JUDGE

Norfolk, VA
September *10*, 2013